ROBERT J. YORIO (SBN 93178)
yorio@carrferrell.com
ILENE GOLDBERG (SBN 168051)
igoldberg@carrferrell.com
CARR & FERRELL LLP
411 Borel Avenue, Suite 603
San Mateo, CA 94402
Telephone:  (650) 812-3400
Facsimile:  (650) 812-3444

Attorneys for Plaintiffs
U.S. VENTURE PARTNERS XII, L.P.,
U.S. VENTURE PARTNERS XII-A, L.P. and
THE BOARD OF TRUSTEES OF THE LELAND
STANFORD JUNIOR UNIVERSITY

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| U.S. VENTURE PARTNERS XII, L.P.,  U.S. VENTURE PARTNERS XII-A, L.P. and THE BOARD OF TRUSTEES OF THE LELAND STANFORD JUNIOR UNIVERSITY,<br><br>          Plaintiffs,<br><br>     vs.<br><br>RUNWAY, LTD., an Israeli company and SHLOMO TOUBOUL, an Israeli citizen,<br><br>          Defendants. | CASE NO.<br><br>**COMPLAINT FOR DECLARATORY JUDGMENT**<br><br>**DEMAND FOR JURY TRIAL** |

        Plaintiffs U.S. VENTURE PARTNERS XII, L.P., U.S. VENTURE PARTNERS XII-A, L.P. and THE BOARD OF TRUSTEES OF THE LELAND STANFORD JUNIOR UNIVERSITY, (collectively "Plaintiffs"), hereby allege for their Complaint against Defendants RUNWAY, LTD., an Israeli company and SHLOMO TOUBOUL, an Israeli citizen, (collectively "Defendants") as follows:

**INTRODUCTION**

This action is brought by Plaintiffs against Defendants seeking a declaratory judgment of no liability under the terms of a written agreement between the parties. Plaintiffs allege as follows:

**NATURE OF THE ACTION**

1.     This is an action arising under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, seeking a declaratory judgment of no liability under the terms of a written agreement between the parties, and such other relief as the Court deems just and proper.

2.     A true and correct copy of the agreement at issue, the Secondary Share Purchase and Sale Agreement, made as of August 29, 2023 (the "Secondary Share Agreement") is attached hereto as Exhibit 1.

**THE PARTIES**

3.     Plaintiff U.S. VENTURE PARTERS XII, L.P. is a limited liability partnership organized and existing under the laws of the State of Delaware with its principal place of business located in Menlo Park, California.

4.     Plaintiff U.S. VENTURE PARTNERS XII-A, L.P. is a limited liability partnership organized and existing under the laws of the State of Delaware with its principal place of business located in Menlo Park, California.

5.     Plaintiff THE BOARD OF TRUSTEES OF THE LELAND STANFORD JUNIOR UNIVERSITY is the custodian of the endowment and all the properties of Stanford University, a private university located in Palo Alto, California.

6.     On information and belief, Defendant Shlomo Touboul is a citizen of Israel residing in Kfar Chaim, Israel.

7.     On information and belief, Defendant Runway, Ltd. is a private limited company organized and existing under the laws of Israel with its principal place of business located in Beit HaLevi, Israel.

**JURISDICTION**

8.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1332 because this action involves claims arising under the Declaratory Judgment Act,

28 U.S.C. §§ 2201 and 2202, and based on diversity of citizenship.

9.  This Court has diversity jurisdiction because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and the matter is between citizens of a State and of a foreign state. 28 U.S.C. § 1332(a) (2).

10.  This Court has personal jurisdiction over Defendants because the contractual obligations at issue involve California-based entities and the claims involve activities that were conducted in California or purposefully directed at California. A substantial part of the events giving rise to the claims occurred in this District.

11.  For these reasons and the reasons set forth below, a justiciable controversy exists between the parties, which is of sufficient immediacy and reality to warrant declaratory relief in this Court.

## DIVISIONAL ASSIGNMENT

12.  The claims in this action arose in the City of Menlo Park, County of San Mateo where a substantial part of the events or omissions giving rise to the claims occurred, and this action should therefore be assigned to the San Francisco Division of this Court.

13.  An actual and justiciable controversy exists between Plaintiffs and Defendants under the Secondary Share Agreement in that Defendants contend that Plaintiffs are obligated to purchase what are called Second Tranche Shares in AirEye, Ltd. ("AirEye") and have allegedly breached that agreement by not purchasing said shares. Plaintiffs allege that the conditions precedent to the obligation to purchase Second Tranche Shares have not occurred and that they are not in breach of the purchase provisions of the Secondary Share Agreement.

14.  AirEye, Ltd. is a private limited company organized and existing under the laws of Israel with its principal place of business located in Tel Aviv, Israel.

15.  The Secondary Share Agreement was made as of August 29, 2023. In pertinent part, the obligation to purchase up to 158,680 Second Tranche Shares is set forth in Section 1.3 of the Secondary Share Agreement. Second Tranche Shares may be purchased pursuant to a Qualified Financing which is defined in Section 1.3(a) as the completion of an equity financing for an aggregate amount of cash proceeds equal to $5,000,000 or more.

COMPLAINT FOR DECLARATORY JUDGMENT

16.     Second Tranche Shares may also be purchased pursuant to a Partial Qualified Financing which is defined in Section 1.3(b) as the completion of an equity financing for an aggregate amount of cash proceeds of at least $2,500,000 but less than $5,000,000, and in such case, the number of Second Tranche Shares to be purchased shall be reduced on a sliding scale, pro rata basis, according to the amount of the cash proceeds received upon the completion of that equity financing.

17.      In either case, the obligation to purchase Second Tranche Shares is dependent on, among other conditions, the completion and closing of the equity financing.

18.     Following the execution of the Secondary Share Agreement, and from time to time, USVP has provided loans to AirEye to support the operations of the company.

19.     In February and March 2024, AirEye sought equity financing for the company and entered into a share purchase agreement for the sale of AirEye Series A-1 Preferred Stock and Series A-2 Preferred Stock in April 2024. This April 2024 Preferred Share Purchase Agreement provided for up to $7 million in equity financing from new investors.

20.     The sought after equity financing from new investors did not materialize and the proposed sale of Series A-1 Preferred Stock and Series A-2 Preferred Stock by AirEye did not close.

21.     On August 18, 2024, Defendant Touboul sent an email to USVP alleging that Plaintiffs were obligated to purchase all of the Second Tranche Shares from him despite the fact the no equity financing had occurred.

22.     USVP promptly disputed Defendant Touboul's allegations and informed him that there was no breach of the Secondary Share Agreement because of the absence of equity financing , and that USVP was not obligated to purchase the Second Tranche Shares.

23.     An actual and justiciable controversy exists between Plaintiffs and Defendants concerning their  respective rights and obligations under the provisions of the Secondary Share Agreement.

COMPLAINT FOR DECLARATORY JUDGMENT

**FIRST CLAIM FOR RELIEF**
**(Declaratory Judgment)**

Plaintiffs restate and incorporate by reference each preceding paragraph, as if fully set forth herein.

24.     Plaintiffs have not breached the terms of the Secondary Share Agreement and are not obligated to purchase any Second Tranche Shares from Defendants.

25.     An actual controversy, within the meaning of 28 U.S.C. §§ 2201 and 2202, exists between Plaintiffs and Defendants concerning their respective rights and obligations under the Secondary Share Agreement. .

26.     Plaintiffs are therefore entitled to a declaratory judgment that they have  not breached the terms of the Secondary Share Agreement, that they are not obligated to purchase any Second Tranche Shares, and that they have no liability to Defendants.

27.     A judicial declaration is necessary and appropriate so that Plaintiffs may ascertain their rights under the Secondary Share Agreement.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request the following relief:

A.     That the Court enter a judgment declaring that Plaintiffs are entitled to a declaratory judgment that they have not breached the terms of the Secondary Share Agreement, that they are not obligated to purchase any Second Tranche Shares, and that they have no liability to Defendants.

B.     That the Court  award to Plaintiffs their costs and expenses incurred in this action;

C.     That the Court award Plaintiffs any and all other relief to which they  may be entitled; and

D.     That the Court award Plaintiffs any other relief it may deem just and proper under the circumstances.

Dated:  January 17, 2025

CARR & FERRELL LLP

By _____
ROBERT J. YORIO

Attorneys for Plaintiffs
U.S. VENTURE PARTNERS XII, L.P.,
U.S. VENTURE PARTNERS XII-A, L.P. and
THE BOARD OF TRUSTEES OF THE
LELAND STANFORD JUNIOR
UNIVERSITY

COMPLAINT FOR DECLARATORY JUDGMENT

**DEMAND FOR JURY TRIAL**

Plaintiffs, U.S. Venture Partners XII, L.P., U.S. Venture Partners XII-A, L.P., and The Board of Trustees of the Leland Stanford Junior University hereby demand a trial by jury of all issues so triable under the law.


Dated:  January 17, 2025                          CARR & FERRELL LLP

By _____
        ROBERT J. YORIO

Attorneys for Plaintiffs
U.S. VENTURE PARTNERS XII, L.P.,
U.S. VENTURE PARTNERS XII-A, L.P. and
THE BOARD OF TRUSTEES OF THE
LELAND STANFORD JUNIOR
UNIVERSITY

COMPLAINT FOR DECLARATORY JUDGMENT

# EXHIBIT 1

*Execution Copy*

## SECONDARY SHARE PURCHASE AND SALE AGREEMENT

This Secondary Share Purchase and Sale Agreement (this "**Agreement**") is made as of August 29, 2023 (the "**Effective Date**"), by and among the purchasers, severally and not jointly, set forth on Exhibit A hereto (each, a "**Purchaser**" and collectively the "**Purchasers**") and Shlomo Touboul (the "**Seller**"), and, solely for purposes of being bound by Sections 1.4, 1.7, 1.8 and 4.2 hereto, AirEye Ltd., an Israeli limited company (the "**Company**" and together with the Purchasers and the Seller, the "**Parties**"). All references herein to "$" shall mean US dollars.

## RECITALS

**WHEREAS**, the Seller is the record and beneficial owner of 317,360 ordinary shares of the Company (the "**Shares**") in addition to other ordinary shares held by him.

**WHEREAS**, in connection with a convertible debt financing of the Company, the Purchasers and the Company have entered into that certain Convertible Note Purchase Agreement dated on or about the date hereof (the "**Note Purchase Agreement**").

**WHEREAS**, in connection with the issuance of convertible promissory notes pursuant to the Note Purchase Agreement (the "**Notes**") the Seller desires to sell, assign and transfer the Shares to the Purchasers, and the Purchasers, severally and not jointly, desire to purchase that number of Shares set forth opposite each such Purchaser's name on Exhibit A-1 and Exhibit A-2, (the "**Secondary Purchase Commitment**"), subject to the terms and conditions set forth herein (the "**Transfer**"), in consideration of the payment by each Purchaser to the Seller of the consideration set forth opposite such Purchaser's name on Exhibit A-1 and Exhibit A-2.

**NOW THEREFORE**, in consideration of the mutual promises and covenants contained in this Agreement and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

1.    **Secondary Sale and Purchase of Shares**.

1.1.    **Purchase and Sale**.

(a)    Subject to the terms and conditions of this Agreement and in reliance upon the representations and warranties set forth herein, at the First Tranche Closing (as defined below), the Seller will sell, assign and transfer to each Purchaser participating in such First Tranche Closing, and each Purchaser, severally and not jointly, will purchase from the Seller at such First Tranche Closing a number of Shares equal to one-half of such Purchaser's Secondary Purchase Commitment, as set forth opposite such Purchaser's name on Exhibit A-1 hereto, at the Per Share Purchase Price (as defined below), free and clear of any pledge, lien, hypothecation, encumbrance, charge, claim, contractual rights, equitable interest or security interest of any kind or character, or any other right of any third party ("**Lien**"), in consideration of the aggregate purchase price set forth on Exhibit A-1 hereto (the "**First Tranche Purchase Price**"). Each person or entity who becomes a Lender pursuant to the Note Purchase Agreement shall become a Purchaser party hereunder by executing a counterpart signature page hereto (a "**New Purchaser**") and the Company shall update Exhibit A-1 and Exhibit A-2 for such New Purchaser's First Tranche

Shares, First Tranche Purchase Price, Second Tranche Shares and Second Tranche Purchase Price, as applicable and as such terms are defined herein. As used herein, the "**Per Share Purchase Price**" means $1.41795, as adjusted for any stock splits, combinations or other reclassifications or restructuring of the equity of the Company.

        **(b)**      Subject to the terms and conditions of this Agreement and in reliance upon the representations and warranties set forth herein, at the Second Tranche Closing (as defined below), the Seller will sell, assign and transfer to each Purchaser, and each Purchaser, severally and not jointly, will purchase from the Seller a number of Shares equal to the balance of such Purchaser's Secondary Purchase Commitment, as set forth opposite such Purchaser's name on Exhibit A-2 hereto at the Per Share Purchase Price, as such number of Shares shall be adjusted for any stock splits, combinations or other reclassifications or restructuring of the equity of the Company (together, the "**Second Tranche Shares**"), free and clear of any Lien, in consideration of the aggregate purchase price set forth on Exhibit A-2 hereto (the "**Second Tranche Purchase Price**" and together with the First Tranche Purchase Price, the "**Purchase Price**").

    **1.2.**    **Tranche Closing**. The purchase and sale of up to an aggregate of 158,680 Shares (the "**First Tranche Shares**") as set forth on Exhibit A-1 (the "**First Tranche Closing**") shall be held on the date that is sixty (60) calendar days after the date hereof, subject to the satisfaction of the conditions set forth in Sections 4 and 5 hereof. In the event that as of the First Tranche Closing less than 156,680 Shares are purchased by Purchasers hereunder, U.S. Venture Partners XII, L.P. and/or its affiliated entities (collectively, "**USVP**") shall purchase no later than ten (10) business days after the First Tranche Closing any such shortfall in Shares purchased at the Per Share Purchase Price as such number of Shares shall be adjusted for any stock splits, combinations or other reclassifications or restructuring of the equity of the Company.

    **1.3.**    **Second Tranche Closing**.

        **(a)**      **Full Qualified Financing.** If, following the First Tranche Closing, the Company completes an equity financing pursuant to which the Company issues its capital shares for an aggregate amount of cash proceeds equal to $5,000,000 or more (in one or more closings of the same financing), excluding proceeds from the conversion of any convertible debt instruments or SAFEs, (a "**Qualified Financing**"), then the Company shall provide written notice to the Purchasers set forth on Exhibit A-2 of the completion of the Qualified Financing (the "**Second Tranche Notice**"), and the Seller will sell, assign and transfer to each Purchaser, and each Purchaser, severally and not jointly, will purchase from the Seller its Second Tranche Shares (the "**Second Tranche Closing**") in a closing which shall occur no less than fifteen (15) days after the date of the Second Tranche Notice as set forth in the Second Tranche Notice. For clarity, the Qualified Financing shall be deemed to have occurred on the last closing of such equity financing at which, when combined with all prior closings of the same financing, $5,000,000 in proceeds has been received by the Company through the issuance of its capital shares. The Second Tranche Closing shall be subject to the terms and conditions of this Agreement and in reliance upon the representations and warranties set forth herein. In the event that as of the Second Tranche Closing less than 156,680 Shares are purchased by Purchasers hereunder, USVP shall purchase no later than ten (10) business days after the Second Tranche Closing any such shortfall in Shares purchased at the Per Share Purchase Price as such number of Shares shall be adjusted for any stock splits, combinations or other reclassifications or restructuring of the equity of the Company.

**(b)** **Partial Qualified Financing**. If, following the First Tranche Closing, and prior to a Qualified Financing, the Company completes an equity financing pursuant to which the Company issues its capital shares for an aggregate amount of cash proceeds of at least $2,5000,000 but less than $5,000,000 (in one or more closings), excluding proceeds from the conversion of any convertible debt instruments or SAFEs, (a **"Partial Qualified Financing"**), then the Company shall provide written notice to the Seller and the Purchasers set forth on Exhibit A-2 of the completion of the Partial Qualified Financing (the **"Reduced Second Tranche Notice"**), and the Seller will sell, assign and transfer to each Purchaser, and each Purchaser, severally and not jointly, will purchase from the Seller its amount of Second Tranche Shares described below in this Section 1.3(b) at the Per Share Purchase Price in a closing which shall occur no less than fifteen (15) days after the date of the Second Tranche Notice as set forth in the Second Tranche Notice (the **"Reduced Second Closing"**). The Reduced Second Closing shall be subject to the terms and conditions of this Agreement and in reliance upon the representations and warranties set forth herein. If the equity financing proceeds in the Partial Qualified Financing are $2,500,000, the amount of Second Tranche Shares which the Seller shall sell and each Purchaser shall purchase shall be reduced by fifty percent (50%). In the event that the equity financing proceeds in the Partial Qualified Financing are greater than $2,500,000 but less than or equal to $5,000,000, the foregoing fifty percent (50%) reduction shall be reduced on a sliding scale, pro rata basis so that there shall be no reduction in the number of the number of Shares purchased if such financing is for $5,000,000 in proceeds received in exchange for the Company's securities (in which case it shall be a Qualified Financing). If after a Reduced Second Closing, the Company issues its capital shares in an additional equity financing of the Company and at such additional equity financing, the proceeds from such additional financing, excluding proceeds from the conversion of any convertible debt instruments or SAFEs, when combined with the proceeds of the Partial Qualified Financing are $5,000,000, the Company shall send written notice thereof to the Seller and the Purchasers, and no later than fifteen (15) days after such notice, the Seller shall sell to each Purchaser and each Purchaser, severally and not jointly, shall purchase any remaining Shares which have not been sold and purchased as set forth on Exhibit A-2 at the Per Share Price in a final Closing. For clarity, the requirement of the Purchasers to purchase their respective portion of the Shares set forth on Exhibit A-2 shall occur only one time which may be either through the process set forth in Section 1.3(a) or this Section 1.3(b), but not both. The Closings described in this Section 1.3(b) are not an initial closing of a Qualified Financing.

**1.4.** **Early Optional Purchase**. Notwithstanding the above, at any time prior to the First Tranche Closing or the Second Tranche Closing any Purchaser may elect to purchase its First Tranche Shares or Second Tranche Shares, as applicable, by written notice delivered to the Seller (an **"Election Notice"**). The Seller shall sell to such Purchaser and such Purchaser shall purchase from the Seller such Purchaser's First Tranche Shares or Second Tranche Shares, as the case may be, on the date specified in the Election Notice, which shall not be sooner than two (2) business days after the date of the Election Notice, for the First Tranche Purchase Price or Second Tranche Purchase Price, as applicable (an **"Early Closing"**). At an Early Closing, the Seller and the electing Purchaser shall execute and deliver to the Company a share transfer deed for the number of Shares to be purchased by such electing Purchaser in substantially the form set forth on Exhibit B.

**1.5.** **Early Required Purchase**. In the event of a Deemed Liquidation Event (as defined in the Company's Amended and Restated Articles of Association in effect at such time)

or a transaction or series of related transactions in which any "person" or "group" (within the meaning of Section 13(d) and 14(d) of the Securities Exchange Act of 1934, as amended), becomes the "beneficial owner" (as defined in Rule 13d-3 under the Securities Exchange Act of 1934, as amended), directly or indirectly, 100% of the outstanding voting securities of the Company (each a "**Sale of the Company**") at any time prior to the First Tranche Closing or Second Tranche Closing pursuant to which the initial distribution to the shareholders of the Company from such Sale of the Company (exclusive of any proceeds held in escrows, held for milestone achievements or other proceeds holdbacks) on account of their share holdings of such First Tranche Shares and/or Second Tranche share Shares, as applicable (the "**Initial Shareholder Distribution**") is at least $2,500,000, such pending First Tranche Closing and/or Second Tranche Closing, as the case may be, shall close immediately prior to and contingent upon the Sale of the Company at which time the Seller shall sell and the Purchasers shall purchase their respective First Tranche Shares and/or Second Tranche Shares, as applicable; provided that if Initial Shareholder Distribution is $2,500,000, the Purchase Price for such First Tranche Shares and/or Second Tranche Shares, as applicable, shall be reduced by fifty percent (50%). In the event that the Initial Shareholder Distribution is greater than $2,500,000 but less than or equal to $5,000,000, the foregoing fifty percent (50%) reduction shall be reduced on a sliding scale, pro rata basis so that there shall be no reduction in Purchase Price if the initial distribution to the shareholders are at least $5,000,0000. For clarity, there shall be no required First Tranche Closing or Second Tranche Closing if any such Closings is pending prior to a Sale of the Company for which the Initial Shareholder Distribution is less than $2,500,000.

    **1.6.**    **Termination**. All obligations of the Purchaser to purchase Shares hereunder will terminate upon the occurrence of any of the following: (a) the Company makes an assignment for the benefit of creditors, or admits in writing its inability to pay its debts as they become due, or files a voluntary petition (or other request) for bankruptcy protection, or files any petition (or other request) or answer seeking for itself any reorganization, arrangement, dissolution or similar relief under any present or future statute, law or regulation, or the Company or its board of directors or majority stockholders shall take any action looking to the dissolution or liquidation of the Company; (b) within thirty (30) days after the commencement of any proceeding against the Company seeking any bankruptcy reorganization, arrangement, dissolution or similar relief under any present or future statute, law or regulation, such proceeding shall not have been dismissed, or within thirty (30) days after the appointment without the consent or acquiescence of the Company of any trustee, receiver or liquidator of the Company or of all or any substantial part of the properties of the Company, such appointment shall not have been vacated; (c) any liquidation, dissolution or winding up of the Company which is not a Deemed Liquidation Event.

    **1.7.**    **Shareholders' Agreements**. The Shares are subject to the terms and conditions of the Amended and Restated Articles of Association of AirEye Ltd., as currently in effect, (the "**Articles of Association**"). Each of the Seller and the Purchasers agree that, as of the Closing (as defined below) at which a Purchaser purchases Shares, (a) all of the Seller's rights and obligations under the Articles of Association arising or accruing after such Closing with respect to the Shares shall be irrevocably assigned to, and assumed by, the Purchasers in accordance with the terms of the Articles of Association; and (b) the Purchasers shall hold all of the rights, benefits and obligations to which the Seller would otherwise have been entitled and subject pursuant to the Articles of Association with respect to the Shares.

**1.8.    Certificates; Exhibits**. At the First Tranche Closings, the Second Tranche Closing, any Reduced Second Tranche Closing and any Early Second Closing (each, and a "**Closing**" and collectively, the "**Closings**"), the Company shall deliver to each Purchaser a certificate (electronic or physical) representing the Shares being purchased by such Purchaser at such Closing against payment of the purchase price therefor by check payable to the Seller, by wire transfer to a bank account designated by the Seller or by any combination of such methods. Without the requirement of consent or execution of an amendment hereto by any party, the Company shall update Exhibit A-1 and Exhibit A-2 to this Agreement at each Subsequent First Tranche Closing to reflect each Subsequent Purchaser's Secondary Purchase Commitment.

**1.9.    Company Acknowledgement**.    The Company hereby acknowledges that all corporate actions required to be taken by the Company in order to approve the Transfer have been taken, and consents to the Transfer and confirms that all waivers of any right of notice, right of first refusal and any other applicable transfer restrictions and all applicable notice requirements with respect to the Transfer have been obtained; provided, that each Purchaser hereby expressly agrees that the Shares shall be bound by all terms and conditions of the Articles of Association applicable to shares held by an Investor; provided, further, that (a) such waiver shall apply only to the Transfer pursuant to this Agreement and (b) each Purchaser will hold the Shares subject to all of the restrictions noted elsewhere in this Agreement.

**2.    Representations, Warranties and Covenants of the Seller**.  The Seller hereby represents and warrants to each Purchaser as of each Closing that:

**2.1.    Authority; Enforceability**.  The Seller has full power and authority to execute and deliver this Agreement and to perform his obligations hereunder, including to sell, transfer, assign and deliver the Shares as provided in this Agreement.  This Agreement is enforceable against the Seller in accordance with its terms, except (i) as may be limited by applicable bankruptcy, insolvency, reorganization, moratorium, and other laws of general application affecting enforcement of creditors' rights generally and (ii) as may be limited by laws relating to the availability of specific performance, injunctive relief, or other equitable remedies.

**2.2.    Compliance with Other Instruments**.  The execution, delivery and performance of this Agreement and the consummation of the transactions contemplated by this Agreement by the Seller will not result in any violation or default that may render the transactions that are the subject matter of this Agreement null, void and of no force and effect, under: (i) any instrument, judgment, order, writ or decree which binds the Seller; (ii) any note, indenture or mortgage applicable to the Seller; (iii) any agreement to which the Seller is a party or by which it is bound; or (iv) any provision of any law, rule or regulation applicable to the Seller.

**2.3.    Consents**.  All consents, approvals, authorizations and orders required for the execution and delivery of this Agreement by the Seller and the transfer of the Shares under this Agreement have been obtained and are in full force and effect.  The Seller is not required to obtain any other consent, approval, permit, declaration, registration or authorization of the action by, or filing with, any person (either an individual or entity), including (as applicable) any court, governmental or regulatory authority, commission, administrative agency or non-governmental third party, in connection with the execution and performance of this Agreement by the Seller or the consummation of the transactions by the Seller contemplated hereunder.

**2.4.    Litigation.** There is no action, suit, investigation or proceeding pending against or threatened in writing against the Seller before any court, arbitrator or any governmental authority which challenges or seeks to, or could reasonably be expected to, prevent, enjoin, alter or materially delay the transactions contemplated by this Agreement.

**2.5.    Ownership.** The Seller is the sole record and beneficial owner of the Shares. As of the date hereof the Shares are, and at the Closing, the Shares will be, free and clear of any Liens, other than restrictions under applicable securities laws to which the Shares as owned by the Purchasers will be subject and those contained in the Articles of Association. The Seller has not entered into any agreement or understanding related to the Shares or the transactions contemplated by this Agreement, including any voting agreements or rights or restrictions related to the Shares (other than as set forth in the Articles of Association). The Seller has power and authority to sell, transfer, assign and deliver the Shares as provided in this Agreement.

**2.6.    Sophisticated Investor.** The Seller (a) together with the Seller's advisors, is a sophisticated entity familiar with transactions similar to those contemplated by this Agreement, (b) has adequate information concerning the business and financial condition of the Company to make an informed decision regarding the sale of the Shares, and (c) has independently and without reliance upon Purchasers, and based on such information and the advice of such advisors as the Seller has deemed appropriate, made its own analysis and decision to enter into this Agreement and understands that the Shares may have a current or future value greater than the amount paid for the Shares under this Agreement. The Seller acknowledges that no Purchaser nor any affiliate thereof is acting as a fiduciary or financial or investment advisor to the Seller, and has not given the Seller any investment advice, opinion or other information on whether the sale of the Shares is prudent. The Seller acknowledges and understands that the Shares may increase in value after the date hereof and after any Closing and that Seller shall not realize the upside potential with respect to the Shares, but the Seller nevertheless desires to sell the Shares at this time for the Purchase Price. The Seller acknowledges that neither the Company, the Purchaser nor any of their respective affiliates are acting as a fiduciary or financial or investment adviser to the Seller, and none of such persons has given the Seller any investment advice, opinion or other information on whether the sale of the Shares pursuant hereto is prudent. The Seller further acknowledges that (w) the Company or the Purchasers currently may have, and later may come into possession of, information with respect to the Company that is not known to the Seller and that may be material to a decision to sell the Shares ("**Seller Excluded Information**"), (x) the Seller has determined to sell the Shares notwithstanding any lack of knowledge of the Seller Excluded Information, (y) the value of the Shares may significantly appreciate or depreciate over time and by agreeing to sell the Shares to the Purchasers pursuant to this Agreement, the Seller is giving up the opportunity to sell the Shares at a higher price in the future and (z) neither the Company nor the Purchasers shall have liability to the Seller, and the Seller to the fullest extent of the law waives and releases any claims, whether known or unknown, that it might have against the Company and the Purchasers, whether under applicable securities laws or otherwise, with respect to the nondisclosure of the Seller Excluded Information in connection with the sale of the Shares and the transactions contemplated by this Agreement. The Seller understands that Purchasers will rely on the accuracy and truth of the foregoing representations, and Seller hereby consents to such reliance.

**2.7.    Full Disclosure.** The Seller has made and conducted his own investigation, analysis and diligence with respect to the sale of the Shares (without reliance on the Company or the

Purchasers) as it has deemed necessary in order to make his sale decision, and he has made his own assessment and has satisfied himself concerning the relevant financial, tax, legal, and other considerations relevant to the sale of the Shares. The Seller further acknowledges that the Seller has received all the information it considers necessary or appropriate for deciding whether to enter into this Agreement. The Seller further represents that it has had an opportunity to ask questions and receive full answers from the Company concerning, among other things, its financial condition, its management, its prior activities and any other information which the Seller considers relevant or appropriate in connection with entering into this Agreement.

**2.8.** **Taxes**. The Seller acknowledges that the execution of this Agreement and the sale of the Shares may have immediate tax consequences and that any tax liability applicable to the Seller and triggered as a result of the sale of the Shares by the Seller shall be borne exclusively by the Seller.

**2.9.** **Survival**. The representations and warranties of the Seller contained in this Section 2 shall survive each Closing hereunder and continue in full force and effect thereafter. In no event shall the Seller be liable for any incidental, indirect, consequential, special or punitive losses and damages.

**3.** **Representations and Warranties of Each Purchaser**. Each Purchaser, severally and not jointly, hereby represents and warrants to the Seller:

**3.1.** **Organization; Good Standing and Qualification**. Such Purchaser (a) if an entity, is duly organized, validly existing and in good standing under the laws of its jurisdiction of organization and (b) has full power and authority to execute and deliver this Agreement and to perform its obligations hereunder.

**3.2.** **Authorization; Enforceability**. This Agreement (a) has been duly and validly authorized, executed and delivered by such Purchaser and (b) constitutes a valid and legally binding obligation of such Purchaser, enforceable against such Purchaser in accordance with its terms, except (i) as may be limited by applicable bankruptcy, insolvency, reorganization, moratorium, and other laws of general application affecting enforcement of creditors' rights generally and (ii) as may be limited by laws relating to the availability of specific performance, injunctive relief, or other equitable remedies.

**3.3.** **Compliance with Other Instruments**. The execution, delivery and performance of this Agreement and the consummation of the transactions contemplated by this Agreement by such Purchaser will not result in any violation or default that may render the transactions that are the subject matter of this Agreement null, void and of no force and effect, under: (i) any instrument, judgment, order, writ or decree which binds such Purchaser; (ii) any note, indenture or mortgage applicable to such Purchaser; (iii) any agreement to which such Purchaser is a party or by which it is bound; or (iv) any provision of any law, rule or regulation applicable to such Purchaser; provided that the foregoing is not a representation with respect to any obligations of or restrictions on the Seller under the Articles of Association.

**3.4.** **Consents**. Such Purchaser is not required to obtain any consent, approval, permit, declaration, registration or authorization of, or make any filing with, any person (either an

7

individual or any entity), including any court, governmental or regulatory authority, commission, administrative agency or non-governmental third party, in connection with the execution and such Purchaser's performance of this Agreement or the consummation of the transactions by Purchaser contemplated hereunder.

**3.5.** __Litigation__. There is no action, suit, investigation or proceeding pending against or threatened in writing against such Purchaser before any court, arbitrator or any governmental authority which challenges or seeks to, or could reasonably be expected to, prevent, enjoin, alter or materially delay the transactions contemplated by this Agreement.

**3.6.** __Restricted Shares__. Such Purchaser understands that the sale of the Shares by the Seller to such Purchaser has not been, and will not be, registered under the Securities Act of 1933, as amended (the "__Securities Act__"), and therefore such shares cannot be resold unless registered under the Securities Act or an exemption from such registration is available, and that the Company may require an opinion of counsel reasonably satisfactory to the Company confirming that an exemption from such registration is available for such sale or transfer.

**3.7.** __Investment for Own Account__. Such Purchaser is purchasing its respective portion of the Shares for its own account for investment purposes only, and not with a view to or for sale in connection with any distribution of the applicable portion of the Shares.

**3.8.** __Sophisticated Investor__. Such Purchaser recognizes that the purchase of the applicable portion of the Shares involves a high degree of risk in that (i) an investment in the Company is highly speculative and only investors who can afford the loss of their entire investment should consider investing in the Company and acquiring the Shares; (ii) such Purchaser may not be able to liquidate its investment; (iii) transferability of the securities comprising the Shares is extremely limited; (iv) such Purchaser could sustain the loss of its entire investment; and (v) the Company is and will be subject to numerous other risks and uncertainties, including without limitation, significant and material risks. Such Purchaser acknowledges that (x) Seller is an officer and director of the Company, and that the Company or the Seller currently may have, and later may come into possession of, information with respect to the Company that is not known to such Purchaser and that may be material to a decision to purchase the Shares ("__Purchaser Excluded Information__"), (y) such Purchaser has determined to sell the Shares notwithstanding any lack of knowledge of the Purchaser Excluded Information, and (z) neither the Company nor the Seller shall have liability to such Purchaser, and such Purchaser to the fullest extent of the law waives and releases any claims, whether known or unknown, that it might have against the Company and the Seller, whether under applicable securities laws or otherwise, with respect to the nondisclosure of the Purchaser Excluded Information in connection with the sale of the Shares and the transactions contemplated by this Agreement.

**3.9.** __Accredited, Experienced Investor__. Such Purchaser represents that it is an "accredited investor" as such term is defined in Rule 501 of Regulation D promulgated under the Securities Act and that it is able to bear the economic risk of an investment in the Shares. Such Purchaser acknowledges that it has prior investment experience, including without limitation, investment in non-listed and non-registered securities, and/or has had the opportunity to consult with and employ the services of an investment advisor, attorney or accountant to evaluate the

merits and risks of such an investment, and that such Purchaser recognizes the highly speculative nature of this investment.

**3.10.    Legends**. Such Purchaser acknowledges that the certificates representing the Shares currently include one or more legends, and that when the Company issues new certificates reflecting the transfer, assignment and reclassification of the Shares to such Purchaser, such certificates will bear one or more legends, stating that the Shares have not been registered under the Securities Act and setting forth or referring to the restrictions on the transferability and sale of the Shares.

**3.11.    Exculpation Among Purchasers**.   Such Purchaser acknowledges that it is not relying upon any person, firm, or corporation in making its investment or decision to purchase the Shares.  Without limiting the generality of the foregoing, such Purchaser acknowledges that it is not relying on any research, due diligence preparation, projection or forecast, including but not limited to any financial or technological projection, prepared by any other Purchaser or such other Purchaser's affiliates in connection with making its decision to purchase Shares.  Further, such Purchaser agrees that no other Purchaser nor the respective controlling persons, officers, directors, partners, agents, consultants or employees of any other Purchaser shall be liable to such Purchaser for any action heretofore or hereafter taken or omitted to be taken by any of them in connection with such Purchaser's purchase of the Shares.

**3.12.    Survival**. The representations and warranties of such Purchaser contained in this Section 3 shall survive the Closing hereunder and continue in full force and effect thereafter. In no event shall any of the Purchasers be liable for any incidental, indirect, consequential, special or punitive losses and damages.

**4.    Conditions of Each Purchaser's Obligation**. The several and not joint obligations of each Purchaser to purchase its allocated portion of the Shares, as set forth on Exhibit A-1 and Exhibit A-2, are subject to the fulfillment on or before a Closing at which such Purchaser purchases Shares of each of the following conditions:

**4.1.    Representations and Warranties**.   The representations and warranties of the Seller contained in Section 2 shall be true, accurate and correct on and as of such Closing, with the same effect as though such representations and warranties had been made on and as of such date.

**4.2.    Delivery of Shares**. (i) the Seller shall have delivered to the Company's counsel for re-registration a share transfer deed duly executed by the Seller for the number of Shares to be purchased by such Purchaser in substantially the form set forth on Exhibit B-1, and (ii) the Seller shall surrender to the Company the certificate or certificates representing the Seller's Shares being sold under such Closing (or if any share certificate(s) have been lost, stolen or destroyed, an affidavit of that fact in the form attached hereto as **Exhibit B-2**) for cancellation by the Company. The Company shall have delivered to each Purchaser evidence of registration of the applicable number of Shares in its name.

**5.    Conditions of the Seller's Obligations**.   The obligations of the Seller to the Purchasers to consummate the sale of the Shares are subject to the fulfillment on or before each Closing of each of the following conditions:

**5.1.    Share Transfer Deed**. Each applicable Purchaser shall have delivered to the Company's counsel for re-registration a share transfer deed duly executed by such Purchaser and for the number of Shares to be purchased by such Purchaser in substantially the form set forth on Exhibit B-1

**5.2.    Representations and Warranties**.  The representations and warranties of the Purchasers contained in Section 3 shall be true, accurate and correct on and as of the Closing, with the same effect as though such representations and warranties had been made on and as of such date.

**5.3.    Payment of Purchase Price**. Each Purchaser shall have delivered to the Seller the applicable portion of the Purchase Price set forth opposite such Purchaser's name on Exhibit A-1 or Exhibit A-2, as applicable, by bank transfer to the bank account of the Seller, in U.S. Dollars, pursuant to wiring instructions given in writing by the Seller to the Purchasers prior to Closing.

**6.    Miscellaneous.**

**6.1.    Notices**. All notices and other communications given or made pursuant to this Agreement shall be in writing and shall be deemed effectively given upon the earlier of actual receipt or: (a) personal delivery to the party to be notified, (b) when sent, if sent by email (except where a notice is received stating that such email has not been successfully delivered) during normal business hours of the recipient, and if not sent during normal business hours, then on the recipient's next business day, or (c) three (3) business days after deposit with an internationally recognized overnight courier, freight prepaid, specifying delivery no later than the third business day, with written verification of receipt. All communications shall be sent to the respective parties at their address as set forth on the signature page hereto or to such other address on which any party may inform the other parties in accordance with the provisions of this Section 6.2. As used herein, a business day shall mean a day that banks are open for business in Israel and the United States.

**6.2.    Breach**. Any breach of the terms, conditions or provisions of this Agreement by one Purchaser shall not be deemed a breach of the terms, conditions or provisions of this Agreement by any other Purchaser.

**6.3.    Entire Agreement**.  This Agreement contains the entire understanding of the parties hereto with regard to the subject matter contained herein, and supersedes all prior agreements, understandings or intents between or among any of the parties hereto with respect to such subject matter.

**6.4.    Amendments; Waiver**.  No amendment, modification or waiver of this Agreement shall be binding or effective for any purpose unless it is made in a writing signed by each Party hereto.

**6.5.    Severability**.  If one or more provisions of this Agreement are held to be unenforceable under applicable law, such provision shall be excluded from this Agreement and the balance of the Agreement shall be interpreted as if such provision were so excluded and shall be enforceable in accordance with its terms.

**6.6.    Further Assurances**. The parties hereto agree to execute such further instruments and to take such further action as may be reasonably necessary to carry out the intent of this Agreement.

**6.7.    Successors and Assigns**. This Agreement shall be binding upon the transferees, successors and assigns of the parties hereto.

**6.8.    Counterparts**. This Agreement may be executed in counterparts with the same force and effect as if each of the signatories had executed the same instrument.

**6.9.    Costs and Expenses**. The Seller and each Purchaser will pay its own expenses in connection with the transactions contemplated hereby; provided that the Company shall, immediately after the Effective Date, reimburse the reasonable fees and out of pocket expenses of the Seller, including legal and professional fees, in an amount not to exceed $10,000 + VAT against a duly issued VAT invoice.

**6.10.    Redomiciling**. In the event the Company is redomiciled to be Delaware, US corporation, the terms hereof shall be interpreted so that references to ordinary shares are references to common stock of such corporation, references to the Company's Amended and Restated Articles of Association are references to such corporation's certificate of incorporation as then in effect, and other references herein are similarly interpreted to mean such corporation's counterparts.

[<em>Signature Page Follows</em>]

IN WITNESS WHEREOF, the parties have executed this Agreement as of the Effective Date.

**SELLER:**

**Shlomo Touboul**

By: _____

**Address for Notice:**

_____

_____

_____

IN WITNESS WHEREOF, the parties have executed this Agreement as of the Effective Date.

**PURCHASER:**

**U.S. VENTURE PARTNERS XII, L.P.**
**U.S. VENTURE PARTNERS XII-A, L.P.**
**By: Presidio Management Group XII, L.L.C.**
**The General Partner of Each**

By: _____

Name: Dale Holladay

Title: Attorney-In-Fact

Address for Notice: 1460 El Camino Real, Suite 100
Menlo Park CA 94025 USA

Signature Page to AirEye Ltd. Secondary Share Purchase and Sale Agreement

* DocuSign Envelope ID: DE3AFA1B-9EBD-49E0-986A-C0B5AEED5074

IN WITNESS WHEREOF, the parties have executed this Agreement as of the Effective Date.

**PURCHASER:**

**THE BOARD OF TRUSTEES OF THE LELAND STANFORD JUNIOR UNIVERSITY (SBST)**

By: _Rajkumar Chellaraj_

Name: Rajkumar Chellaraj

Title: Authorized Signatory

Address for Notice:

School & Department Fund Administration

635 Knight Way Stanford, CA 94305-7297

Phone: 650-721-2200

Email: sdfadmins@stanford.edu

Signature Page to AirEye Ltd. Secondary Share Purchase and Sale Agreement

DocuSign Envelope ID: 5BFAC06B-82FC-4FF3-8F4D-E0F338EFADB5

IN WITNESS WHEREOF, the parties have executed this Agreement as of the Effective Date.

**PURCHASER:**

**THE BOARD OF TRUSTEES OF THE LELAND STANFORD JUNIOR UNIVERSITY (DAPER I)**

By: *Brian Talbot*
    CF43DF9'3325471...

Name: Brian Talbot

Title: Authorized Signatory

Address for Notice:

Address: School & Department Fund Administration

635 Knight Way

Stanford, CA 94305-7297

Fax/Phone: (650)721-2200
Email: sdfadmins@stanford.edu

Signature Page to AirEye Ltd. Secondary Share Purchase and Sale Agreement

IN WITNESS WHEREOF, the parties have executed this Agreement as of the Effective Date.

**COMPANY**

**AirEye Ltd.**

By: _____

Name: __Shlomo Touboul_____

Title: __Director_____

Address for Notice:

_____

_____

_____

_____

**EXHIBIT A-1**

**PURCHASERS – Initial First Tranche Closing**

| Purchaser | Number of Ordinary Shares Purchased | First Tranche Purchase Price |
|---|---|---|
| U.S. Venture Partners XII, L.P. | 149,213 | $211,576.57 |
| U.S. Venture Partners XII-A, L.P. | 7,573 | $10,738.14 |
| The Board of Trustees of the Leland Stanford Junior University (SBST) | 947 | $1,342.80 |
| The Board of Trustees of the Leland Stanford Junior University (DAPER I) | 947 | $1,342.80 |
| **TOTAL** | **158,680** | **$225,000.31** |

**EXHIBIT A-2**

**PURCHASERS - Second Tranche Closing**

| Purchaser | Number of Ordinary Shares Purchased | Second Tranche Purchase Price |
|---|---|---|
| U.S. Venture Partners XII, L.P. | 149,213 | $211,576.57 |
| U.S. Venture Partners XII-A, L.P. | 7,573 | $10,738.14 |
| The Board of Trustees of the Leland Stanford Junior University (SBST) | 947 | $1,342.80 |
| The Board of Trustees of the Leland Stanford Junior University (DAPER I) | 947 | $1,342.80 |
| **TOTAL** | **158,680** | **$225,000.31** |

DocuSign Envelope ID: C788AA4D-BDBE-48AC-82B6-4CEA0254DA0D

## EXHIBIT B-1

## SHARE TRANSFER DEED

FOR VALUE RECEIVED, the undersigned, Shlomo Touboul ("Seller"), hereby sells, assigns and transfers shares of the Ordinary Shares of ILS 0.001 par value each of AirEye Ltd., an Israeli limited company, in the amount listed below, standing in the name of the Seller on the books of the Company, to the undersigned Purchaser ("Purchaser") and in the amount listed below, and does hereby constitute and appoint [        ] as attorney-in-fact, with full power of substitution, to transfer said stock on the books of said corporation.

The Purchaser hereby accepts the transfer of such shares and agrees to assume all obligations of the Seller under all agreements involving the Company.

IN WITNESS WHEREOF, the Seller and the Purchaser have executed this instrument this 29 day of August, 2023

SELLER:

SHLOMO TOUBOUL

By: _____

Witness:_____

PURCHASER:

**U.S. VENTURE PARTNERS XII, L.P.**
**U.S. VENTURE PARTNERS XII-A, L.P.**

**By: Presidio Management Group XII, L.L.C.**
**The General Partner of Each**

By: _____
Name: Dale Holladay
Title: Attorney-In-Fact
Witness:_____

| Purchaser | Number of Ordinary Shares Purchased |
|---|---|
| U.S. VENTURE PARTNERS XII, L.P. | 100,677 |
| U.S. VENTURE PARTNERS XII-A, L.P. | 5,109 |

Signature Page to AirEye Ltd. Secondary Share Purchase and Sale Agreement

DocuSign Envelope ID: AE8B04B1-3548-4E11-AE53-169F42EBB17C

## EXHIBIT B-1

### SHARE TRANSFER DEED

FOR VALUE RECEIVED, the undersigned, Shlomo Touboul ("Seller"), hereby sells, assigns and transfers shares of the Ordinary Shares of ILS 0.001 par value each of AirEye Ltd., an Israeli limited company, in the amount listed below, standing in the name of the Seller on the books of the Company, to the undersigned Purchaser ("Purchaser") and in the amount listed below, and does hereby constitute and appoint [          ] as attorney-in-fact, with full power of substitution, to transfer said stock on the books of said corporation.

The Purchaser hereby accepts the transfer of such shares and agrees to assume all obligations of the Seller under all agreements involving the Company.

IN WITNESS WHEREOF, the Seller and the Purchaser have executed this instrument this 29 day of August 2023

SELLER:

SHLOMO TOUBOUL

By: _____

Witness: _____

PURCHASER:

THE BOARD OF TRUSTEES OF THE LELAND STANFORD JUNIOR UNIVERSITY (SBST)

By: _____

Name: Rajkumar Chellaraj

Title: Authorized Signatory
School & Department Fund Administration

Witness: 635 Knight Way Stanford, CA 94305-7297
Phone: 650-721-2200
Email: sdfadmins@stanford.edu

| Purchaser | Number of Ordinary Shares Purchased |
|---|---|
| The Board of Trustees of the Leland Stanford Junior University (SBST) | 947 |

DocuSign Envelope ID: AE8B04B1-3548-4E11-AE53-169F42EBB17C

## EXHIBIT B-1

## SHARE TRANSFER DEED

FOR VALUE RECEIVED, the undersigned, Shlomo Touboul ("Seller"), hereby sells, assigns and transfers shares of the Ordinary Shares of ILS 0.001 par value each of AirEye Ltd., an Israeli limited company, in the amount listed below, standing in the name of the Seller on the books of the Company, to the undersigned Purchaser ("Purchaser") and in the amount listed below, and does hereby constitute and appoint [        ] as attorney-in-fact, with full power of substitution, to transfer said stock on the books of said corporation.

The Purchaser hereby accepts the transfer of such shares and agrees to assume all obligations of the Seller under all agreements involving the Company.

IN WITNESS WHEREOF, the Seller and the Purchaser have executed this instrument this 29 day of August , 2023

**SELLER:**

**SHLOMO TOUBOUL**

By: _____

Witness: _____

**PURCHASER:**

**THE BOARD OF TRUSTEES OF THE LELAND STANFORD JUNIOR UNIVERSITY (DAPER I)**

By: _____

Name: Brian Talbot

Title: Authorized Signatory

Fax/Phone: (650)721-2200

E-mail: sdfadmins@stanford.edu

Witness: _____

Address: School & Department Fund Administration
635 Knight Way Stanford, CA 94305-7297

| Purchaser | Number of Ordinary Shares Purchased |
|---|---|
| The Board of Trustees of the Leland Stanford Junior University (DAPER I) | 947 |

DocuSign Envelope ID: C788AA4D-BDBE-48AC-82B6-4CEA0254DA0D

## EXHIBIT B-1

## AFFIDAVIT OF LOST CERTIFICATE

The undersigned hereby represents and warrants as follows:

1.    The undersigned is the sole legal and beneficial owner of __107,680__ Ordinary Shares of nominal value of NIS0.001 (the "Shares") of AirEye Ltd. (the "Company").

2.    The undersigned is unable to locate the share certificate representing the Shares (the "Certificate") after a diligent search, and has reason to believe and represents that the Certificate has been either lost, misplaced, stolen, destroyed or never issued to it.

3.    The undersigned has never sold, assigned, pledged, endorsed, subjected to a security interest, transferred, deposited under any agreement, hypothecated, or in any other way disposed of either the Certificate(s) or any of the Shares represented by the Certificate(s) in whole or in part or any interest therein, nor has the undersigned signed any proxy, power of attorney or other authorization respecting the Shares that is now outstanding and in force or shall become outstanding in the future, or otherwise disposed of the Shares; and no one other than the undersigned has or have asserted any right, title, claim, equity, or interest in, to, or respecting the Certificate(s), the Shares or any proceeds thereof, all, except as set forth in the Secondary Agreement.

4.    The undersigned hereby agrees to the cancellation of such Certificate(s). Should the undersigned find or recover any of the Certificate(s), the undersigned will immediately surrender the same to the Company for cancellation without requiring any consideration therefor.

IN WITNESS WHEREOF, the undersigned has executed this Affidavit of Lost Certificate as of the 29 day of August, 2023    .

Name of Shareholder: Shlomo Touboul

Signature: _____

By: Shlomo Touboul